UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION AT LAFAYETTE

| | | |
|---|---|---|
| FABIAN HUIZAR, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Cause No. 4:22-CV-86-PPS |
| | ) | |
| TRANSUNION LLC, | ) | |
| | ) | |
| Defendant. | ) | |

**<u>OPINION AND ORDER</u>**

Fabian Huizar purchased an SUV using a loan obtained from Horizon Bank. Huizar eventually fell behind on his car payments which led Horizon to repossess it. But Horizon botched the repossession according to a state court judge which resulted in Huizar obtaining a judgment absolving him of any responsibility to pay his delinquent car bill. Following the judgment, Huizar began to dispute the Horizon debt as it appeared in his consumer reports prepared by the "big three" consumer reporting agencies—Experian, Equifax, and TransUnion. This case involves TransUnion's reporting of Huizar's debt to Horizon.

After sending five dispute letters to TransUnion, none of which resulted in the fixing of the alleged inaccuracy in his credit report, Huizar turned to the courts. He filed this lawsuit against TransUnion under the Fair Credit Reporting Act (FCRA), 15 U.S.C. § 1681 *et seq.*, seeking to recover damages for what he believes is inaccurate reporting of the Horizon Bank debt in his consumer reports. Huizar and TransUnion have filed cross motions for summary judgment each seeking judgment in its favor on all claims. [*See* DE 138; DE 143]. Because there

remain genuine issues of material fact about the accuracy of TransUnion's reporting of Huizar's credit history and the reasonableness of its investigation, both motions for summary judgment will be **DENIED**.

## Factual Background

_Huizar's Car Loan and the Tippecanoe Circuit Court Proceedings_

On January 12, 2018, Fabian Huizar used a loan serviced by Horizon Bank to purchase a 2015 Ford Explorer for $22,767.93 for his wife (then his fiancée). [DE 143-5 at ¶1]. It didn't take Huizar long to get behind in his payments. By July 2018, Huizar and his wife had missed several monthly payments on the Horizon loan. [_Id_. at ¶13]. Because of these missed payments, Horizon employed a repo company to repossess Huizar's car on July 24, 2018. [DE 155 at ¶8]. [1] After the repossession, Huizar called Horizon to negotiate the missed payments and retrieve his car. [DE 153-1 at 1].[2] Instead, Horizon told Huizar it had accelerated his loan, which required him to repay the loan in full before Horizon would return the car. [_Id._] A couple months later, Horizon sold the car at an auction for $16,000, which Horizon claimed left a deficiency balance of $7,679.08 on Huizar's loan. [_Id._ at 2]. Thereafter, Horizon demanded Huizar pay the deficiency balance and Huizar responded by demanding the return of his vehicle. [DE 143-5 at ¶¶41–42].

---

[1] DE 155 cited throughout the Factual Background is Plaintiff's Response to Defendant's Statement of Material Facts.

[2] DE 153-1 cited throughout the Factual Background is Defendant's Response to Plaintiff's Statement of Facts.

Huizar sued Horizon on November 22, 2018, in state court concerning the circumstances of Horizon's repossession of his car. [DE 153-1 at 2]. Huizar prevailed at a February 2020 bench trial, and in a July 7, 2020, order, the Circuit Court held Huizar had "defaulted on the loan and Horizon was entitled to accelerate the loan" but that Horizon's repossession breached the peace. [DE 143-5 at 3-4]. As a result, the Circuit Court ruled in Huizar's favor on his consumer protection claims and awarded damages. [*Id*. at 10]. Importantly, as another form of relief, the Circuit Court "eliminate[d] [Horizon's] deficiency judgment" and therefore reduced Huizar's awarded damages by the $7,679.08 deficiency judgment amount. [*Id*. at 9]. At bottom, what this meant is that as of the date of the order, Huizar no longer owed Horizon any money. The judge also denied Horizon's counterclaim for breach of contract and deficiency judgment. [*Id*. at 10–11]. Horizon received the Circuit Court order sometime before August 6, 2020. [DE 153-1 at 16].

The Circuit Court later entered a Final Appealable Order on September 21, 2020, that modified the July 7, 2020, order to dismiss one of Huizar's claims and reduce his total awarded damages. The Final Appealable Order did not amend, and in fact restated, the conclusions of law in the July 7, 2020, order that eliminated Horizon's deficiency judgment and reduced Huizar's damages by that sum. At bottom, excluding attorney's fees, the Court awarded Huizar damages in the amount of $4,580.03. [3] Horizon appealed, and on October 13, 2021, the Indiana Court of Appeals affirmed all but a portion of the Circuit Court's Final Appealable

---

[3] The Court could not find the September 21, 2020, Final Appealable Order in the record in this case, but has reviewed it as it is included in the record of the related Experian matter also pending before the Court. [See DE 182-8 in *Huizar v. Experian Info. Sols., Inc.*, 4:22-cv-85].

Order concerning attorney's fees awarded to Huizar. [DE 155 at ¶14; *see also Bank v. Huizar*, 178 N.E.3d 326 (Ind. Ct. App. 2021)].

### *Huizar's Dispute Letters to TransUnion*

The day following the July 7, 2020, order Huizar mailed his first dispute letter to TransUnion concerning the Horizon debt. [DE 153-1 at 4]; [DE 143-6, Ex. 7]. The parties refer to debts reported in a credit report as a "tradeline" which is evidently a term of art in the credit reporting business. I'll follow the parties' lead with use of that term. Anyway, Huizar's July 8, 2020, dispute letter stated, "I do not owe anything to Horizon" and "It is showing as a balance of $7,594 but I don't owe anything." [DE 143-6 at 1]. As shown above, what Huizar said in the letter was undoubtedly true—he didn't in fact owe Horizon any money by virtue of the state court judgment he had received against Horizon. Huizar's letter went on to explain that he was worried he would not be able to buy a home for his family because of the reporting and that he attached proof showing he doesn't owe money to Horizon. [*Id.*] The dispute letter included a copy of the judgment that was entered against Horizon. [*Id.* at 8-18].

After receiving Huizar's July 2020 dispute, TransUnion sent an Automated Credit Dispute Verification (ACDV) form to Horizon for completion. [DE 155 at 12]. This is a form sent from the credit reporting agencies to the furnishers of the information to verify the accuracy of a debt. In August 2020, TransUnion received Horizon's response indicating that Huizar owed $7,641 and that his account was "charged off." [DE 153-1 at 5]. After receiving the completed ACDV form from Horizon, TransUnion sent the dispute results to Huizar showing an outstanding balance of $7,641 and stating that the account was "charged off" with

$22,558 being written off. [*Id*.]; [DE 143-12, Ex. 19]. The dispute results did not mention the judgment in Huizar's favor. [DE 153-1 at 6]; [DE 143-12, Ex. 19].

In November 2020, Huizar mailed his second dispute letter to TransUnion contesting the Horizon tradeline. [DE 153-1 at 7]; [DE 143-14, Ex. 24]. In this letter, Huizar notes that the balance "went up since last time" and "[i]f you look at the court records, you'll see I don't owe this." [DE 153-1 at 7]. Upon receiving this dispute, TransUnion again engaged Horizon in the ACDV process. Horizon submitted an ACDV form to TransUnion indicating that the past due balance was $7,875 and that the account was "charged off." [*Id*. at 8]; [DE 143-16, Ex. 29]. TransUnion again sent the dispute results to Huizar indicating that the information on the account had been verified as accurate. [DE 153-1 at 8]; [DE 143-18, Ex. 32]. Again, the dispute results did not mention the judgment in favor of Mr. Huizar. [DE 158-1 at 8]; [DE 143-18, Ex. 32].

Continuing with this dance, Huizar mailed another dispute letter to TransUnion in January 2021 again challenging the Horizon tradeline. [DE 153-1 at 9]; [DE 143-20, Ex. 39]. In this letter Huizar stated "[t]he Horizon account is still incorrect." Huizar also complained that TransUnion was "still including incorrect information even after I explained." [DE 143-20 at 1]. Predictably, TransUnion again engaged in the ACDV process with Horizon to address the dispute. [DE 153-1 at 9]. In February 2021, Horizon submitted an ACDV response to TransUnion indicating that Huizar owed $7,920 and that the account was charged off. [*Id*.]; [DE 143-22, Ex. 46]. In March 2021, TransUnion sent the dispute results to Huizar. [DE 153-1 at

5

9]; [DE 143-23, Ex. 47]. The dispute results again made no mention of the judgment in Huizar's favor. [DE 143-23, Ex. 47].

In November 2021, Huizar sent another dispute letter to TransUnion challenging the accuracy of the Horizon tradeline. [DE 153-1 at 10]; [DE 143-28, Ex. 57]. In this one, Huizar told TransUnion that "I've disputed with you multiple times . . . [p]lease help me." [DE 143-28 at 1]. Huizar also stated that the account shouldn't be reporting because it was "wiped away by a Court of Law." [*Id.*] Huizar included an account info screenshot showing a Horizon Bank balance of $8,388. [*Id.*] In December 2021, TransUnion provided Huizar with dispute results indicating no balance but showing that Horizon had charged off $22,558. [DE 153-1 at 11]; [DE 143-31, Ex. 66]. The dispute results again showed no mention of the judgment in Huizar's favor. [DE 143-31, Ex. 66].

In December 2021, Huizar mailed yet another dispute to TransUnion regarding the Horizon tradeline. [DE 153-1 at 11]; [DE 143-34, Ex. 72]. In this letter, Huizar told TransUnion that Horizon "credited the amount they claim I still owed." [DE 143-34, Ex. 72]. Huizar also states "[n]ow it says Pay Status is Charge Off." [*Id.* at 1]. TransUnion again engaged in the ACDV process with Horizon and in January 2022, Horizon submitted an ACDV response to TransUnion indicating that Huizar's account was charged off. The parties dispute whether there was additional context regarding the charge off. [DE 153-1 at 12]; [DE 143-35, Ex. 74]. Yet again, there was no mention of the judgment in favor of Mr. Huizar. [DE 143-35, Ex. 74].

Finally, on August 4, 2022, Horizon submitted an Automated Universal Data (AUD) form to TransUnion which updated the Horizon tradeline to indicate a $0 balance.[4] [DE 153-1 at 12-13]; [DE 143-37, Ex. 94].

Eventually, fed up with being blown off for the better part of two years by each of the credit bureaus, Huizar sought refuge with the courts. He filed four separate actions under the Fair Credit Reporting Act all of which landed on my docket. He sued the three credit reporting agencies—TransUnion, Experian and Equifax—along with a fourth action against Horizon. In the case presently before the court, both Huizar and TransUnion each seek summary judgment.

## Standard of Review

Summary judgment must be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). On a motion for summary judgment, all facts and reasonable inferences are construed in a light most favorable to the non-moving party. *Waukegan Potawatomi Casino, LLC v. City of Waukegan*, 128 F.4th 871, 873 (7th Cir. 2025).

## Discussion

Congress enacted the Fair Credit Reporting Act, codified at 15 U.S.C. § 1681 *et seq.*, "to ensure fair and accurate credit reporting, promote efficiency in the banking system, and protect consumer privacy." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 52 (2007). As collectors

---

[4] AUDs are initiated by the data furnisher to request out-of-cycle credit history updates. [DE 153-1 at 12]. *See also*, https://www.e-oscar.org/gettingstarted (last visited 1/7/26).

and distributors of consumer credit information, Consumer Reporting Agencies ("CRAs") are

important players within the FCRA's statutory scheme. The FCRA defines CRAs as:

> [A]ny person which, for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties, and which uses any means or facility of interstate commerce for the purpose of preparing or furnishing consumer reports.

15 U.S.C. § 1681a(f). There is no dispute that TransUnion is a CRA.

Huizar alleges TransUnion violated three provisions of the FCRA: (1) 15 U.S.C. §

1681e(b); (2) 15 U.S.C. § 1681i(a); and (3) 15 U.S.C. § 1681i(c). I will address Huizar's claims

under § 1681i(a) and § 1681e(b) together because those theories overlap in many ways. I will

then turn to Huizar's claim under § 1681i(c) relating to whether TransUnion included a

notification of Huizar's dispute in subsequent reports after receiving Huizar's letters.

## I.  Accuracy of Huizar's Consumer Report

First, "[a] threshold requirement for claims under both [§ 1681e(b) and § 1681i] is that

there must be an inaccuracy in the consumer's credit report." *Chuluunbat v. Experian Info. Sols.,*

*Inc.,* 4 F.4th 562, 567 (7th Cir. 2021); *Walton v. BMO Harris Bank N.A.,* 761 Fed.Appx. 589, 591

(7th Cir. 2019) ("Although the reasonableness of a credit reporting agency's procedures under

§ 1681e(b) is not typically a summary-judgment question, [a CRA] cannot be liable as a

threshold matter if it did not report inaccurate information."). Though left undefined by the

FCRA, the Seventh Circuit defines "accuracy" to encompass "both truth and completeness—a

report that is misleading or materially incomplete is inaccurate." *Chaitoff v. Experian Info. Sols.,*

*Inc.*, 79 F.4th 800, 809 (7th Cir. 2023). Indeed, "[a] credit report is inaccurate under § 1681e(b) and § 1681i(a) if it omits accurate information that could reasonably be expected to adversely affect a consumer's creditworthiness." *Id.* at 812. And as is important here, "the information needs to be factually inaccurate, not legally inaccurate." *Thorton v. Experian Info. Sols., Inc.*, 2025 WL 1951743, at *3 (N.D. Ill. July 16, 2025) (citing *Denan v. Trans Union LLC*, 959 F.3d 290, 294 (7th Cir. 2020)).

Huizar alleges his TransUnion credit reports contained two categories of inaccuracies. First, Huizar points to inaccurate balance and amount past due figures for his Horizon account. Second, Huizar argues TransUnion's reporting of the Horizon account as "charged off" and with a listed charge off amount was inaccurate or at least misleading. TransUnion responds that its reports accurately showed Huizar's late payment history and Horizon's writing off of the debt. According to TransUnion, federal regulations *obligated* Horizon to report Huizar's account as charged off after being 120 days past due. [DE 168 at 9-10].

The Parties' designated evidence primarily consists of Huizar's dispute letters (which purportedly cite and sometimes include screenshots of his credit reports), Horizon's ACDV responses, and TransUnion's responses to his disputes. Huizar has also provided the Court with copies of the TransUnion credit reports he says are inaccurate. [DE 143-13, Ex. 21; DE 143-19, Ex. 36; DE 143-24, Ex. 49; DE 143-27, Ex. 54; DE 143-33, Ex. 69; DE 143-36, Ex. 89].

I begin with Huizar's alleged inaccuracies concerning the balance and amount past due figures for his Horizon account. Huizar says his July 2020, November 2020, and January 2021 disputes highlighted these inaccurate balance amounts and balance past due figures on his

credit reports. TransUnion's response to Huizar's July 2020 dispute lists a $7,641 balance as past due for his Horizon account. [DE 143-12, Ex. 19]. The ACDV forms and TransUnion's response to his November 2020 dispute list the balance amount on his Horizon account as $7,875. [DE 143-16, Ex. 29]; [DE 143-18, Ex. 32]. The ACDV forms and TransUnion's response to his January 2021 dispute list his balance past due as $7,920 for his Horizon account. [DE 143-22, Ex. 46]; [DE 143-23, Ex. 47].

TransUnion argues that Huizar's claims of inaccurate balance and balance past due figures fail because he asked TransUnion to resolve a legal dispute instead of a factual one. It is true that CRAs are statutorily obligated to investigate and ensure protection against "factual inaccuracies" but addressing "legal inaccuracies" is "outside the competency of the consumer reporting agencies." *Chuluunbat*, 4 F.4th at 567. "The paradigmatic example of a legal dispute is when a consumer argues that although his debt exists and is reported in the right amount, it is invalid due to a violation of law." *Id.* "In contrast, examples of factual inaccuracies include the amount a consumer owes, and what day a consumer opened an account or incurred a payment." *Id.* at 568.

At first glance, Huizar's reliance on the state court order seems like a "paradigmatic" example of a legal dispute because he asks TransUnion to determine that his debt was invalid as a matter of law. But *Chuluunbat* recognized a key carve out: "[a] legal question may also be resolved as a matter of fact if a tribunal—such as a court or arbitrator—has adjudicated the matter." *Id.* at 568. Let's suppose Huizar had never taken Horizon to court, and he filed a dispute letter with TransUnion stating that he didn't owe Horizon any money because

10

Horizon's repo man had breached the peace during the repossession. That would be an unresolved *legal* question that TransUnion would have no duty to report on. By contrast, once a legal dispute is resolved—as in this case—with a finding the debt is no longer valid, that becomes a factual matter that TransUnion must report accurately.

TransUnion argues that following the July 7, 2020 order, the case continued to be litigated on appeal and that the status of the debt "was not objectively and readily verifiable." [DE 139 at 17]. That's just not true; final judgment was entered by the Tippecanoe County Circuit Court. In any event, TransUnion cannot simply throw its hands up when it receives a court order. *Chaitoff*, 79 F.4th at 815 (noting "CRAs can read and understand legal documents"). Huizar did exactly what the Seventh Circuit advised in *Chuluunbat*: "If the plaintiffs presented court judgments to the consumer reporting agencies showing that the legal ownership of their debts have been adjudicated, the investigation may have been factual in nature." 4 F.4th at 569.

Although Huizar previously owed money to Horizon, beginning on July 7, 2020, the state court orders "eliminate[d]" his obligation to make future payments towards that debt. In other words, *Huizar no longer owed money to Horizon* after that date. (Indeed, Horizon owed *him* money). Under these circumstances, the Court finds there exists a triable issue of fact as to whether the TransUnion reports that continued to report a balance *currently* due on the Horizon account after the July 7, 2020, Order created a materially misleading impression about Huizar's payment and credit history.

In addition, Huizar argues that TransUnion's reporting of his Horizon account as

11

"charged off" was inaccurate and that the amount of the charge off ($22,558) was wrong because it did not include the $16,000 Horizon recovered from the auction of his car. Based on the Court's own review of the record, TransUnion's January 2022, response to Huizar's December 2021 dispute listed a charge off and written off amount of $22,558 for his Horizon account. [DE 143-35, Ex. 74]; [DE 143-45, Ex. 119]. Moreover, it was not until December 2021 following Huizar's fourth dispute that TransUnion reported Huizar's Horizon account as having a $0 balance. [DE 139 at 7]; [DE 155 at ¶ 49]; [DE 139-15, Ex. M].

TransUnion's reporting of Huizar's account as "charged off" and with a charge off amount presents a different question of accuracy than TransUnion's reporting of Huizar's balance amount and balance past due because charge off reporting does not necessarily reflect a *current* debt. Instead, "charge off" refers to "a creditor's decision '[t]o treat (an account receivable) as a loss or expense because payment is unlikely; to treat as a bad debt." *Borowski v. Ally Financial Inc.*, 2023 WL 4207784, at *3 (E.D. Wis. June 27, 2023) (citing Black's Law Dictionary (11th ed. 2019)). After all, "a credit report is intended to include more than a person's current debt; it also includes bill-payment history and other information that a reasonable lender might consider important in deciding whether and at what rate to extend credit." *Herrell*, 218 F.Supp.3d at 792. Indeed, Huizar does not dispute that he missed *previous* payments.

Huizar argues TransUnion's reporting of his Horizon loan as charged off and the amount of the charge off were both inaccurate. These theories of inaccuracy present different factual questions. On the one hand, I find that TransUnion has satisfied its burden on

12

summary judgment to establish that its mere fact of reporting the Horizon account as charged off (setting aside the amount and when) is not inaccurate under the FCRA. It is undisputed that Horizon did in fact charge off Huizar's loan. Huizar's last payment occurred in June 2018, and he concedes he did not repay in full Horizon's loan. Moreover, Horizon's sale of his car at an auction did not recover the full amount of the loan to Huizar. And unlike the state court orders that "eliminated" his deficiency owed to Horizon, Huizar points to no language (nor could he) in the state court orders that held as a matter of law Horizon could not report the account as charged off.

On the other hand, there is a triable question of fact on the accuracy of TransUnion's reporting the amount of the charge off on Huizar's credit reports. TransUnion reported a $22,558 charge off amount on its reinvestigation responses to Huizar's disputes. [DE 143-12, Ex. 19]; [DE 143-18, Ex. 32]; [DE 143-23, Ex. 47]; [DE 143-31, Ex. 66]; [DE 143-45, Ex. 119]. Huizar says this figure does not account for the approximately $16,000 Horizon recovered in the sale of his vehicle at a private auction on September 6, 2018. [DE 153-1 at 2]. TransUnion fails to provide a fulsome response on this point. One can imagine how a charge off amount of over $22,000 on a credit report instead of roughly $7,000 could negatively impact Huizar's credit score. But Huizar's briefing on this point falls short to conclusively establish the point. This will be another factual question for trial.

## II.   Reasonableness of TransUnion's Conduct Under §1681i(a) and § 1681e(b)

After establishing an inaccuracy, "a CRA's liability under both § 1681e(b) and § 1681i(a) turns on whether a CRA acted reasonably." *Chaitoff*, 79 F.4th at 816. Section 1681e(b) of the

FCRA requires CRAs to "follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 1681e(b). By contrast, section 1681i requires consumer reporting agencies to "conduct a reasonable reinvestigation" to determine the accuracy of the disputed information. 15 U.S.C. § 1681i(a)(1)(A).

While both claims require evaluation of the reasonableness of the CRA's conduct, they differ in their scope and requirements. The Seventh Circuit has noted that "reasonable procedures under § 1681e(b) are not proof of a reasonable *reinvestigation* under § 1681i(a)." *Chaitoff*, 79 F.4th at 817 (emphasis added). This makes sense given that the purpose of § 1681i(a) is to provide an avenue to dispute purportedly incorrect information that cleared initial screening and ended up on a consumer's report. Thus, the Seventh Circuit recognizes that "§ 1681i(a)'s reinvestigation requirement mandates a more thorough investigation than § 1681e(b)." *Id.* at 818.

Because this dispute largely focuses on TransUnion's reinvestigation process, I'll begin by addressing the reasonableness of TransUnion's reinvestigation process under §1681i(a). But to be clear, Huizar's complaint about TransUnion's handling of the state court order and its use of the ACDV process undergird his claims of both an unreasonable reinvestigation under § 1681i(a) and a procedure ill designed to assure maximum possible accuracy under § 1681e(b). [DE 161-1 at 17-24]. As such, my discussion of each section of the statute will be related.

### a. Reasonableness of Reinvestigation (15 U.S.C. § 1681i(a))

The FCRA provides a process for consumers to notify a CRA, such as TransUnion, that

14

they dispute the accuracy or completeness of their consumer report. As mentioned, the CRA then must conduct a "reasonable reinvestigation to determine whether the disputed information is inaccurate," 15 U.S.C. § 1681i(a)(1)(A), including by considering "all relevant information submitted by the consumer." *Id.* § 1681i(a)(4). The cost benefit analysis for the reasonableness of a CRA's reinvestigation is different because CRA's that receive notice of a dispute can "target its resources in a more efficient manner and conduct a more thorough investigation." *Henson v. CSC Credit Servs.*, 29 F.3d 280, 286–87 (7th Cir. 1994). Thus, while the "parameters of a reasonable investigation will often depend on the circumstances of a particular dispute, it is clear that a reasonable reinvestigation must mean more than simply including public documents in a consumer report or making only a cursory investigation into the reliability of information that is reported to potential creditors." *Chaitoff*, 79 F.4th at 818 (citation omitted).

Here, Huizar disputed the information contained in the Horizon tradeline of his TransUnion consumer report on five different occasions between 2020 and 2021. [DE 153-1 at 4-12]. Recall that on all five of those occasions TransUnion engaged the ACDV process to reinvestigate the disputes. [*Id.*]  What does this actually mean? Tamaya Tucker, a Specialist in the Litigation Support Department of TransUnion, helped to explain. She testified that when TransUnion is notified that a consumer believes information in their credit file is inaccurate TransUnion will initiate its reinvestigation process. [DE 139-2, Tucker Decl.¶ 20]. As part of this process TransUnion will first consider and review all relevant information provided by the consumer to properly identify the consumer and the items that are believed to be

inaccurate, along with the nature of the inaccuracy. [*Id*. at ¶ 27]. Tucker states that if the consumer provides supporting documentation with the dispute, a TransUnion agent will review the documentation to determine whether the supporting documents are sufficient to delete or update the account as requested by the consumer, or whether an internal policy allows TransUnion to make the requested update. [*Id*. at ¶ 29].

So, was TransUnion's reinvestigation process reasonable in this case? Recall that Huizar provided TransUnion with the Tippecanoe Circuit Court Order with his first dispute letter. [DE 143-6 at 8-18, Ex. 7]. Huizar asserts that "[a]ll TransUnion had to do was read the Judgment to determine that Mr. Huizar owed nothing, and the credit reporting was inaccurate." [DE 161-1 at 10]. Viewing the evidence of TransUnion's handling of the court order in a light most favorable to TransUnion, there is a genuine question as to whether it should have taken action to modify the information provided by Horizon upon receiving the court order.

A quick review of the order shows that it's not entirely clear how Huizar's debt to Horizon should have been reported after the judgment in Huizar's favor. The "Findings of Fact" section of the order acknowledges that Huizar and his wife (then fiancée) fell behind on their car payments. [DE 143-5 at 1-3, Ex. 4]. The "Conclusions of Law" section of the order states that "Huizar defaulted on the loan and Horizon was entitled to accelerate the loan." [*Id*. at 3]. Conversely, the order also states that "Horizon failed to act in a commercially reasonable manner during the collection process and . . . [a]s result, the Court hereby restrains Horizon from collecting a deficiency judgment." [*Id*. at 9]. The order makes it clear that Huizar never

16

paid the $7,679.08 he owed on the SUV, but it also makes it clear that he was no longer required to. In other words, the debt was extinguished. [*Id.*]

The question of how this should be reported in a consumer report presents a conundrum. On the one hand, obtaining a favorable judgment doesn't make a delinquent borrower automatically creditworthy. Indeed, there's no dispute that Huizar repeatedly *failed to pay his bills.* That seems like something a would-be credit provider might want to know about. On the other hand, a consumer's credit report should not reflect an amount owed when the consumer—by virtue of a judgment—in fact no longer owes the money.

All of this is to say that reasonable minds could disagree as to whether the judgment was enough that TransUnion should have changed its reporting, and that is enough to raise a genuine issue of material fact. *Ellison v. United States Postal Serv.*, 84 F.4th 750, 755 (7th Cir. 2023) ("A genuine issue of material fact exists when, based on the evidence, a jury could find for the non-moving party.").

Moving on to TransUnion's ACDV process, Tucker explains that if the supporting documentation from the consumer is not sufficient to delete or update the account, TransUnion then contacts the data furnisher—Horizon Bank in this case—through an Automated Consumer Dispute Verification ("ACDV") form sent through an online platform called e-Oscar. [DE 139-2, Tucker Decl.¶ ¶ 31-45]. The purpose of the ACDV form is to request that the data furnisher investigate and verify or update the account. [*Id.*] Presented with a judgment that, arguably, makes it unclear whether the information provided by Horizon should be deleted or changed, TransUnion moved forward with its ACDV process.

17

In his briefing, Huizar argues that TransUnion's ACDV process constituted an unreasonable reinvestigation because it did nothing more than parrot back whatever Horizon included in its ACDV forms. [DE 161-1 at 9]. As I've stated, the judgment made clear that Huizar was no longer on the hook to pay Horizon, but it didn't make clear that Horizon's reporting was inaccurate such that it should have been deleted or changed. In that situation, it seems reasonable to check with Horizon and see what their investigation turns up. However, Huizar disputed the Horizon tradeline in his consumer report on *five different occasions* between 2020 and 2021 and every single time TransUnion did nothing but engage in the same ACDV process. As one court put it, the ACDV process is not *per se* reasonable in every circumstance. *Dulworth v. Experian Info. Sols. Inc.*, 2024 WL 2319958, at *16 (S.D. Ind. May 22, 2024).

This is one of those cases. A reasonable juror could conclude that TransUnion's reflexive and exclusive reliance on the ACDV process is precisely the type of "cursory investigation" that has been deemed by the Seventh Circuit as impermissible. *Chaitoff*, 79 F.4th at 818 (citation omitted). This is especially true in the face of a court order showing that Huizar no longer owed the debt. As the Seventh Circuit noted, "it is disputable whether Experian's reliance on an ACDV response that conflicted with other documents in its possession amounted to a reasonable reinvestigation." *Id.* at 821. *See also*, *Losch v. Nationstar Mortg. LLC*, 995 F.3d 937, 946 (11th Cir. 2021).

While, as pointed out by TransUnion, the ACDV process has been found reasonable in some instances, a reasonable reinvestigation under § 1681i(a) requires more of a CRA than

"merely parroting information." *Moran v. Embark Card Servs., LLC*, 2025 WL 2803261, at *4 (N.D. Ill. Oct. 2, 2025) (citing *Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir. 1997)). Parroting information from Horizon is exactly what Huizar claims TransUnion did in response to each of his disputes. [DE 161-1 at 9].

Interestingly, Huizar's briefing mentions very little about TransUnion's dispute agents and their process of handling disputes. Huizar explains that TransUnion outsources the processing of its consumer disputes to a company in India called Teleperformance aka Intelenet. [DE 161-1 at 5]. Huizar asserts that all his disputes to TransUnion were handled by agents employed by TransUnion's foreign contractor, Intelenet. [*Id.*] Huizar says that the following individuals handled each of his disputes:

- July of 2020 – Justin Gonsalves and/or Sachin Sharma at Intelenet
- December of 2020 – Anthony Nadar at Intelenet
- February of 2021 – Umesh Gupta at Intelenet
- November of 2021 – Kartik Waghela at Intelenet
- December of 2021 – Kartik Waghela at Intelenet
- January of 2022- Jayesh Shah at Intelenet

[*Id.*]

Huizar provides no additional detail about these foreign dispute agents, any instructions they received regarding the handling of consumer disputes, or any specific actions they took in relation to his disputes. [*Id.*]

Instead of providing evidence about what TransUnion did or did not do, Huizar focuses heavily on the reinvestigation process of Horizon Bank (the data furnisher). [DE 161-1 at 20-23]. Huizar points to deposition testimony from Horizon's 30(b)(6) representative Cindy

Pickens to argue that Horizon failed to conduct a reasonable reinvestigation. [*Id.*] Cindy

Pickens was Horizon's Collection Supervisor. [DE 161-1 at 21]; [DE 143-41, Ex. 103, Pickens

Dep. at 8:8-9]. Pickens explained that part of her job entails reviewing and answering credit

disputes. [DE 143-41, Ex. 103, Pickens Dep. at 8:20-9:3]. Pickens testified during her deposition

that she downloaded the Tippecanoe Circuit Court Order and that she read and understood

the order. [DE 161-1 at 21]; [DE 143-41, Ex. 103, Pickens Dep. at 60:2-15]. Pickens admitted that

neither of the judgments she reviewed said that Huizar owed Horizon Bank any money. [DE

161-1 at 21]; [DE 143-41, Ex. 103, Pickens Dep. at 62:24-63:1].

As explained by Huizar, Pickens testified that her understanding of the Tippecanoe

Court Order was that Huizar owed nothing to Horizon. Indeed, the opposite was true;

Horizon owed Huizar money. [DE 161-1 at 21]; [DE 143-41, Ex. 103, Pickens Dep. at 73:15-

74:10]. Pickens stated that she never questioned the judgment, and conceded that, in light of

the judgment, reporting that Huizar still owed Horizon money would be inaccurate. [DE 161-1

at 21-22]; [DE 143-41, Ex. 103, Pickens Dep. at 34:1-2 and 74:11-14]. Pickens also testified that

Huizar's balance should have been changed following a review of the judgment and that

Horizon's failure to update Huizar's balance to zero must have been an "oversight." [DE 143-

41, Ex. 103, Pickens Dep. at 75:7-76:7 and 36:2-16].

Through his discussion of Horizon's reinvestigation process and Pickens' deposition

testimony, it seems that Huizar is arguing that TransUnion's ACDV process was unreasonable

and led to the reporting of inaccurate information because it relied solely on Horizon which

itself had a shoddy process. Indeed, Huizar asserts that Horizon "chose to report inaccurate,

20

incomplete, and unverifiable credit information" about him. [DE 161-1 at 22].

The testimony Huizar has pointed to in the record focuses much more on Horizon's reinvestigation process than TransUnion's. And while I have already explained that TransUnion utilizes an ACDV process which is highly deferential to the data furnisher, I am not convinced that Huizar's evidence regarding Horizon's reinvestigation proves as a matter of law that TransUnion's reinvestigation process is unreasonable. Even assuming that the ACDV process led to a consumer report that contained an inaccuracy, that fact alone does not mean that the procedures in place are unreasonable. *Denan v. Trans Union LLC*, 959 F.3d 290, 294 (7th Cir. 2020) ("[T]he FCRA does not require unfailing accuracy from consumer reporting agencies."); *Henson v. CSC Credit Servs.*, 29 F.3d 280, 284 (7th Cir. 1994) ("A credit reporting agency is not liable under the FCRA if it followed 'reasonable procedures to assure maximum possible accuracy,' but nonetheless reported inaccurate information in the consumer's credit report."). The evidence in the record raises a question of fact as to whether TransUnion engaged in a reasonable reinvestigation when handling Huizar's disputes. Whether it was reasonable for TransUnion to rely completely on information from Horizon in the face of numerous disputes and a court order is a genuine issue of material fact.

Nothing in *Denan v. Trans Union LLC*, 959 F.3d 290 (7th Cir. 2020), a case relied on by TransUnion, mandates a different result. For starters, *Denan* is readily distinguishable from this case. In *Denan*, consumers who borrowed from Indian tribes at interest rates prohibited by state usury laws contended that their credit reports were inaccurate because they reported the debts even though the debts were (in their view) uncollectible since they violated state law.

21

*Denan*, 959 F.3d at 292-93. In *Denan*, unlike in our case, no court had answered the question as to whether the loans were invalid. Indeed, that's what makes *Denan* actually cut against TransUnion's position. As the Seventh Circuit noted in that case: "[i]f a court had ruled the loans invalid and Trans Union had continued to report it as a valid debt, then plaintiffs would have grounds for a potential FCRA claim." *Id.* at 296. That describes exactly what happened to Huizar; the state court in this case ruled that Horizon's loans were no longer valid. So, far from supporting TransUnion, *Denan* actually props up Huizar's argument.

In sum, a reasonable jury could conclude that a procedure other than the ACDV process continually used by TransUnion could have uncovered an inaccuracy in the Horizon tradeline. While neither party has definitively shown that TransUnion's repeated use of the ACDV process was an unreasonable reinvestigation of the disputes as a matter of law, they have raised it as a genuine issue of material fact which should be decided at trial.

### b. Reasonableness of Procedures to Assure Maximum Possible Accuracy (15 U.S.C. § 1681e(b))

"The reasonableness of a reporting agency's procedures is normally a question for trial unless the reasonableness or unreasonableness of the procedures is beyond question." *Sarver*, 390 F.3d at 971. The reasonableness of a CRA's procedures does not turn solely on whether a consumer's report contains an inaccuracy. Indeed, "a mistake does not render [the CRA's] procedures unreasonable." *Id.* at 972. CRA's are permitted to rely upon information "received from a source it reasonably believes is reputable . . . unless the agency receives notice of systemic problems with its procedures." *Id.* Given the volume of credit information and

22

disputes CRAs process daily, the Seventh Circuit recognizes that "[w]hether a CRA's procedures are reasonable turns, predictably, on balancing the costs of a marginal return to accuracy against the potential harm to consumers from declining to incur those costs." *Chaitoff*, 79 F.4th at 817.

Let's start with the language of the statute. Section 1681e(b) states that "Whenever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy . . ." 15 U.S.C. § 1681e(b). In its brief in support of its motion for summary judgment, TransUnion lays out its procedures. TransUnion starts by describing its procedures for determining which financial institutions will be allowed to provide it with information about creditors. TransUnion explains that it obtains and reports information from financial institutions, only after first investigating them to ensure they are reputable and understand their obligations as a furnisher under FCRA. [DE 139 at 5]; [DE 139-2, Tucker Decl.¶¶ 13-14]. This element of TransUnion's process primarily concerns the formation of its relationship with furnishers and the reasonableness of this part of TransUnion's procedures are unchallenged by Huizar.

Like his claim of an unreasonable reinvestigation under § 1681i(a), Huizar's issues with TransUnion's procedures to ensure "maximum possible accuracy" focus on TransUnion's reinvestigation process. Nowhere in his briefing does Huizar allege that TransUnion's acceptance of Horizon as a data furnisher resulted from an unreasonable process or procedure. Huizar takes issue with TransUnion's use of the ACDV process in its reinvestigation procedures arguing that "[t]he ACDV system is insufficient as a reinvestigation by

23

TransUnion." [DE 161-1 at 25].

Huizar's complaints regarding TransUnion's failure to act on the Tippecanoe Circuit Court order and its use of the ACDV process all take place after his first dispute. *Young v. Experian Info. Sols., Inc.*, 776 F. Supp. 3d 721, 739 (N.D. Ill. 2025) ("the § 1681e(b) inquiry concerns the steps the CRA takes *before* consumers dispute the accuracy or completeness of the report; the matter of the CRA's reasonableness in responding *after* a consumer has pointed out an inaccuracy is considered under the 'reasonable reinvestigation' provision").

As TransUnion explains, Horizon Bank is a legitimate financial institution which TransUnion had no reason to suspect was providing it with inaccurate reporting. *Sarver v. Experian Info. Sols.*, 390 F.3d 969, 972 (7th Cir. 2004) (explaining that requiring CRAs to engage in background research on information furnished by financial institutions would balloon the costs of their services, which in turn would be passed to consumers). Huizar makes no argument in his summary judgment briefing and points to no evidence suggesting that, prior to his first dispute, TransUnion had reason to doubt Horizon's reporting.

Given Horizon's demonstrated reliability, it was reasonable for TransUnion to trust that Horizon's original information was complete and accurate. *Sarver*, 390 F.3d at 972 (CRA's procedures not unreasonable unless the agency has reason to believe a furnisher's information is unreliable). However, once TransUnion was put on notice by way of Huizar's first dispute (and the Tippecanoe Circuit Court Order) that there was reason to believe that Horizon's reporting was unreliable, it is unclear whether, going forward, there were reasonable procedures in place to ensure the maximum possible accuracy of Huizar's file. *Chaitoff*, 79 F.4th

24

at 817 ("Whether a CRA's procedures are reasonable turns, predictably, on balancing the costs of a marginal return to accuracy against the potential harm to consumers from declining to incur those costs.").

As Huizar states, his initial dispute of the Horizon tradeline "put TransUnion on notice that Horizon was not a reliable source, as the Judgment provided to it directly contradicted the information Horizon supplied to TransUnion." [DE 161-1 at 3]. And while Huizar has not told the Court much about what TransUnion's foreign dispute agents do, it seems clear that there were options other than the ACDV process to ensure maximum possible accuracy. Potential procedures to ensure maximum possible accuracy include allowing dispute agents to review public court dockets to verify an order or allowing dispute agents to forward court orders to an internal legal department for review. Because TransUnion failed to do anything, other than repeatedly engage in the ACDV process, after being put on notice that Horizon's reporting contained potential inaccuracies, there is a genuine issue of material fact as to whether TransUnion has in place reasonable procedures to assure maximum possible accuracy of the information in a consumer's file.

For these reasons, summary judgment on this point in not warranted in favor of Huizar or TransUnion. *See, e.g.*, *McClelland v. Experian Info. Sols., Inc.*, 2006 WL 2191973, at *3 (N.D. Ill. July 28, 2006) (explaining that in most cases, the reasonableness of a CRA's procedures is a question for the jury); *Quinn v. Experian Sols.*, 2004 WL 609357, at *2 (N.D. Ill. Mar. 24, 2004) ("In the vast majority of cases, reasonable procedures should be determined by a jury.").

### III.    Huizar's Section 1681i(c) Claim

In addition to his § 1681i(a) and § 1681e(b) claims, Huizar seeks summary judgment on a § 1681i(c) claim. I discussed above the requirement that CRAs reinvestigate consumer disputes. If a CRA's reinvestigation does not resolve the dispute, a consumer may then "file a brief statement setting forth the nature of the dispute." 15 U.S.C. § 1681i(b). If such a statement of dispute is filed, and "unless there is reasonable grounds to believe that it is frivolous or irrelevant", the CRA "*shall*, in any subsequent consumer report containing the information in question, clearly note that it is disputed by the consumer and provide either the consumer's statement or a clear and accurate codification or summary thereof." 15 U.S.C. § 1681i(c) (emphasis added). Only Huizar moves for summary judgment on this claim.

To establish that TransUnion violated 15 U.S.C. § 1681i(c), Huizar must show: (1) he disputed inaccurate information contained in his credit file; (2) TransUnion's reinvestigation did not resolve his dispute; (3) he filed a statement of dispute with TransUnion upon completion of the reinvestigation; and (4) the statement he filed was not included in subsequent credit reports released by TransUnion. *Quinn*, 2004 WL 609357, at *7.

Huizar has not advanced sufficient undisputed facts to establish he is entitled to judgment on his § 1681i(c) claim as a matter of law. Huizar argues TransUnion "never added a proper statement of [his] dispute to his credit file." [DE 161-1 at 18]. This underbaked argument is unsupported in two key respects. First, Huizar fails to point the Court to any statement within his dispute letters that was either not included or was not accurately summarized by TransUnion in subsequent credit reports. And while there are "no magic

26

words a consumer must incant to request the inclusion of a dispute statement", *Chaitoff*, 79

F.4th at 820, Huizar's briefing does not identify *any* language in his dispute letters that he says

requested TransUnion to add a § 1681i(c) dispute statement to his credit report. I won't go

hunting for such language in the massive record in this case nor will I make Huizar's

argument for him. *See, e.g.*, *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are

not like pigs, hunting for truffles buried in briefs.").

Second, Huizar provides no explanation for what information his credit report omits

(his "proper statement") that he requested TransUnion include. In support of his argument,

Huizar blankly points to Exhibits 21, 36, and 49 to his motion, which are a November 23, 2020,

TransUnion credit report, a January 16, 2021, TransUnion credit report, and a July 24, 2021,

TransUnion credit report. [DE 161-1 at 18]. [*See also*, DE 143-13, Ex. 21; DE 143-19, Ex. 36; DE

143-24, Ex. 49]. Huizar provides no explanation of the statement of dispute these credit reports

purportedly lack. Taking all reasonable inferences in TransUnion's favor, Huizar has failed to

present evidence to prevail on his § 1681i(c) claim on summary judgment.

## IV.    Willfulness, Negligence, and Damages

If all else fails, TransUnion tells me it is entitled to summary judgment because there is

no proof that Huizar was damaged as a result of the inaccurate credit reporting. As I have

done here, the Seventh Circuit, following the Supreme Court's lead in *Safeco*, permits courts to

first answer the "antecedent question of whether a violation [of the FCRA] occurred" before

analyzing a defendant's mental state. *See Persinger v. Sw. Credit Sys., L.P.*, 20 F.4th 1184, 1195

(7th Cir. 2021). Having found Huizar presented facts that create triable issues as to the

accuracy of his consumer reports and the reasonableness of TransUnion's procedures, I now turn to the question of TransUnion's mental state. Huizar alleges both negligent (actionable under 15 U.S.C. § 1681o) and willful (actionable under 15 U.S.C. § 1681n) violations of the FCRA. TransUnion argues Huizar has failed to present evidence of damages to support either theory, which warrants summary judgment on Huizar's FCRA claims.

To prove a negligent violation of the FCRA, Huizar must establish "actual damages." 15 U.S.C. § 1681o(a)(1). "Actual damages require a 'causal connection' between the statutory violation and the harm suffered by the plaintiff." *Persinger*, 20 F.4th at 1194 (citation omitted). These "actual damages" may take the form of pecuniary harms (such as "lost income or out-of-pocket expenses caused by denials of credit, housing, or insurance") or nonpecuniary harms (such as "reputational damage and emotional distress"). *Id*. Nonpecuniary harms must be described in "reasonable detail." *Id*. To prevail on its motion for summary judgment as to Huizar's negligence claims, TransUnion must show that there is no genuine dispute as to whether Huizar suffered actual damages because of TransUnion's conduct. *Bagby v. Experian Info. Sols., Inc.*, 162 F.App'x 600, 603-04 (7th Cir. 2006).

Not surprisingly, a willful violation is treated differently under the FCRA. "A willful violation is one committed with actual knowledge or reckless disregard for the FCRA's requirements." *Persinger*, 20 F.4th at 1195 (citing *Safeco*, 551 U.S. at 57). A company acts with reckless disregard for the FCRA if its actions were (1) "a violation under a reasonable reading of the statute's terms," and (2) the company "ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless." *Safeco*, 551 U.S. at 69.

This is an objective standard. *Id*. at 68–69.

TransUnion sorts Huizar's alleged damages into three categories: (1) denial of a mortgage with Panorama Mortgage Group LLC in March 2022: (2) the cost of mailing letters to TransUnion; and (3) emotional distress. [DE 139 at 8-11]. The first two categories of damages are pecuniary in nature while Huizar's allegation of emotional distress is nonpecuniary.

Huizar applied for several mortgages with Panorama Home Mortgage (also known as Alterra Home Loans). [DE 153-1 at 21]. The Parties' arguments focus on three such applications. In its motion for summary judgment, TransUnion points to Huizar's March 2022 mortgage application with Panorama and September 2023 mortgage application with Flanagan State Bank. [DE 139 at 8-9]. To evaluate Huizar's mortgage application, Panorama and Flanagan obtained "tri-merge" reports from third party companies that compiled Huizar's credit information from Equifax, Experian, and TransUnion. To qualify for a conventional loan, Huizar's median credit score needed to be above 620. [DE 161-1 at 4]. According to Allison Van Pelt, the loan originator at Panorama and Flanagan who handled Huizar's mortgage applications, to qualify for a Federal Housing Administration ("FHA") loan, Huizar's median credit score needed to be at least 580. [DE 143-42, Ex. 100, Van Pelt Dep at 47:15-17]. During the prequalification process for a mortgage, Huizar would have also needed 5% down for a conventional mortgage and 3.5% down for an FHA mortgage. [*Id*. at 56:24-57:1].

For his March 2022 application, Panorama obtained a March 31, 2022, tri-merge report

from Xactus. [DE 148-35].[5] The Xactus report listed Huizar's credit scores from Equifax as 621, from Experian as 615, and from TransUnion as 595. [*Id.* at 2]. The Xactus report contained several negative items, including two mortgage accounts and two other credit accounts that had histories of delinquent payments. [*Id.* at 3–4]. Including the Horizon account, the Xactus report listed three collection accounts. [*Id.* at 4]. For his September 2023 application, Flanagan obtained a September 25, 2023, tri-merge report from Partners Credit & Verification Solutions. [DE 139-31, Ex. 12]. The Partners report listed Huizar's credit scores from Equifax as 543, from Experian as 549, and from TransUnion as 558. [*Id.* at 2.] The Partners report no longer listed Huizar's Horizon account but contained several "derogatory" accounts listed in collection, with missed payment history, and showing as charged-off. [*Id.* at 5–7.] The Parties provide no date or denial letter for the denial of Huizar's March 2022 Panorama application, but Flanagan sent Huizar a letter on October 17, 2023, that denied his Flanagan application. [DE 139-32, Ex. 13]. In response, Huizar points to an April 18, 2021, Xactus report in connection with a third application for a conventional mortgage. That report again showed several delinquent accounts (including the Horizon bank account) and listed the following credit scores: 622 from Equifax, 619 from TransUnion, and 599 from Experian. [DE 143-39 at 2].

This duel of tri-merge reports indicates a factual dispute as to causation. TransUnion does not deny that Huizar was denied a conventional mortgage in April 2021, nor does it deny that subsequent adjustment to the Horizon tradeline sometimes increased his credit scores.

---

[5] The Court could not find the March 31, 2022, tri-merge report in the record in this case. However, the Court has reviewed the document in the related Equifax case currently pending before the Court. As such, this document citation comes from *Huizar v. Equifax Info. Servs. LLC*, 4:22-cv-90.

Instead, TransUnion argues that Huizar would have failed to qualify for a mortgage because he had numerous adverse accounts both before and after TransUnion updated the Horizon balance to $0. [DE 139 at 8-9]. TransUnion also argues that Huizar would have failed to qualify for a mortgage because he did not have the required down payment. [*Id*. at 9]. While it's true that several delinquent accounts existed on Huizar's tri-merge reports, the impact of the Horizon tradeline cannot be written off as indisputably a non-factor. It will be up to Huizar to present evidence that ties the denial of his mortgage applications to TransUnion's credit score reporting specifically.

I next turn to Huizar's allegation of pecuniary damages in the cost of mailing his dispute letters to TransUnion. District courts across the country have adopted the holding in *Casella v. Equifax Credit Info. Servs*. that expenses incurred solely to notify consumer reporting agencies of errors in a consumer report, rather than to "force their compliance with any specific provision of the [FCRA], cannot be compensable as 'actual damages' for a violation of the FCRA." 56 F.3d 469, 474 (2d Cir. 1995); *Moran v. Screening Pros, LLC*, 2020 WL 4724307, at *9 (C.D. Cal. July 30, 2020). Frustratingly, Huizar fails to respond to this argument. Unlike those cases, however, Huizar's dispute letters cite the FCRA and cannot be said to have been sent solely to notify TransUnion of alleged errors. Huizar sent five dispute letters to TransUnion, and certain of those dispute letters cited provisions of the FCRA and explicitly called for TransUnion to act. [DE 143-28 at 2; DE 143-34 at 1–3]. The Court concludes that questions of fact exist as to who paid for the mailing of Huizar's dispute letters and whether those costs were incurred to "force" TransUnion's compliance with the FCRA or for notification purposes

only.

Finally, I turn to Huizar's allegations of non-pecuniary damages. TransUnion is correct that "when the injured party's own testimony is the only proof of emotional damages, he must explain the circumstances of his injury in reasonable detail; he cannot rely on mere conclusory statements." *Sarver*, 390 F.3d at 971 (citation omitted). TransUnion's primary argument is that Huizar's alleged emotional damages were tied to his inability to qualify for a mortgage, which it says he cannot tie to TransUnion's actions. But as I've noted above, this is disputed. And unlike the plaintiff in *Ruffin-Thompkins v. Experian Info. Sols., Inc.*, Huizar has done more than present conclusory statements of emotional distress. 422 F.3d 603 (7th Cir. 2005). There, the plaintiff's summary judgment response failed to explain her own injury instead saying the CRA's actions were "inherently degrading." *Id.* at 610. Here, Huizar provided detailed deposition testimony regarding the stress TransUnion's allegedly inaccurate reporting caused him, the anxiety medication he takes, and the embarrassment he has suffered from not being able to purchase a home like his peers and co-workers. [DE 154 at 19–21]. The Court finds Huizar's testimony provides sufficient detail to survive summary judgment.

Huizar has likewise produced sufficient evidence to sustain his claim of a willful violation of the FCRA. As discussed above, the reasonableness of TransUnion's reliance on the ACDV process and its continued reliance on Horizon's reporting in the face of court orders that raised questions as to whether Huizar currently owed a balance on the Horizon account is an issue of fact that must be decided by the jury. District courts across the country have rejected summary judgment in favor of CRAs on allegations of willful violations of the FCRA

32

where the CRAs continued to rely on information from a furnisher when the consumer raised issues with the accuracy of that information. *See Grigoryan v. Experian Info. Sols., Inc.*, 84 F.Supp.3d 1044, 1091–93 (C.D. Cal. 2014). A jury must first decide whether TransUnion's procedures to ensure maximum possible accuracy and reinvestigations were reasonable, and, if not, whether they were undertaken with reckless disregard of the FCRA's requirements.

\* \* \*

The record before me illustrates that there are genuine issues of material fact that should be presented to a jury at trial. Factual questions which remain are: (1) Whether TransUnion's reporting of the Horizon tradeline in Huizar's file contained inaccurate information; (2) Whether TransUnion failed to conduct a reasonable reinvestigation by not considering the Tippecanoe Circuit Court Order and using the ACDV process for each of Huizar's disputes; (3) Whether TransUnion has in place reasonable procedures to assure maximum possible accuracy; (4) Whether Huizar has suffered actual damages; and (5) Whether TransUnion willfully violated the FCRA. As such, a grant of summary judgment in either direction is not appropriate.

**ACCORDINGLY**:

Plaintiff Fabian Huizar's Motion for Partial Summary Judgment [DE 143] is **DENIED**. Defendant TransUnion LLC's Motion for Summary Judgment [DE 138] is also **DENIED**.

**SO ORDERED**.

ENTERED: January 7, 2026.

/s/ Philip P. Simon
PHILIP P. SIMON, JUDGE
UNITED STATES DISTRICT COURT